UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

GABRIEL RODRIGUEZ,

        Defendant.

**REPORT AND RECOMMENDATION**

12-CR-45S

---

I. **INTRODUCTION**

  Chief Judge Skretny referred this case to this Court under 28 U.S.C. § 636. Pending before the Court is a motion[1] by defendant Gabriel Rodriguez ("Rodriguez") to suppress evidence that two undisclosed witnesses identified him when viewing a three-ring bound photo array, or photo book, of various individuals whom the Government investigated at some point in the history of this case. Rodriguez wants the evidence suppressed because he considers the photo book unduly suggestive. Specifically, Rodriguez objects that the Government filled the photo book only with individuals under investigation; made no effort to insert photographs of individuals who resembled Rodriguez; and presented the photo book to any given witness only after hours of interviews

---

[1] There is no direct motion to suppress currently pending in the docket, but the Court has recognized the request for suppression inherent in Rodriguez's motion for a hearing regarding the same subject matter. (See Dkt. No. 100.)

during which the Government and that witness discussed the case.  The Government opposes suppression because courts have approved the use of a photo book in the past; because nothing in the photo book distinguished Rodriguez from other people depicted; and because the Government asked witnesses only open-ended questions about whether they knew anyone depicted in the photo book.

The Court held an evidentiary hearing on March 25 and May 14, 2013.  (*See generally* Dkt. Nos. 133, 134.)  For the reasons below, the Court respectfully recommends denying Rodriguez's motion.

## II. BACKGROUND

The Court presumes familiarity with the general facts of the case and will proceed to the events surrounding the photo book that emerged from the evidentiary hearing.

### A. *The Photo Book*

The photo book itself consisted of a three-ring notebook containing 35 black-and-white photographs.  Agent Christopher Wisniewski ("Wisniewski") selected every photograph that appeared in the photo book.  Most of the photographs depict a single person, though some depict as many as three or four people.  The photographs all came from booking photos and "open sources" such as social media.  The people depicted in the photographs live in various places in the country and show a mix of age, sex, and race.  Every person depicted in the

individual photographs, and at least one person in any group photograph, was a target, subject, or person of interest at some point in the history of the Government's investigation. The Government lost interest in pursuing some of the people depicted as the investigation progressed, but the photo book never contained "dummy" or "filler" photographs of people who had nothing to do with the investigation or the alleged drug conspiracy.

    **B.**    ***Presentation of the Photo Book***

At the hearing, Wisniewski and Agent Thomas Webb ("Webb") testified credibly and consistently about how the Government used the photo book. Over the course of the investigation, various law enforcement agents interviewed people whom they believed had information relevant to the investigation. The total number of interviews is unknown, but agents testified that they used the photo book for about two years. The interviews sometimes spanned multiple sessions and sometimes lasted as long as about 10 hours. The interviews lasted as long as they did because they were, at least in part, "confirmatory." By "confirmatory," the agents meant that they wanted to confirm that the interviewees actually knew people related to the investigation and were providing truthful answers before exposing part of the investigation through the presentation of the photo book. "If we felt comfortable showing the book, we would then present the book to the witness, open it for them, simply ask them to thumb through the pages and tell us if they recognized anyone." (Dkt. No. 134 at

3

8.) If an interviewee did know someone in the photo book then "[w]e would discuss it further, we would ask them who they were and how they were connected to the case or any information that the witness had about them." (*Id.*) Any interviewee who eventually saw the photo book was never told during the preceding interviews whether anyone mentioned during the interviews would appear in the photo book. The agents never told any interviewee who anyone in the photo book was or why those pictures appeared in the photo book. Twice, during interviews in June 2012 and January 2013, an interviewee recognized Rodriguez in the photo book.

    C.    ***Pending Motion***

Rodriguez seeks suppression of any evidence derived from the photo book presentation as unusual and suggestive. Rodriguez, through counsel, asserts that "I have never seen an identification procedure done the way that this one was. The agents did not follow the accepted procedures for showing their witnesses photographs of the suspects." (Dkt. No. 147 at 5.) According to Rodriguez, agents tainted the two identifications of him by failing to include "dummy" photographs in the photo book and by preceding the presentations of the photo book with lengthy interviews about the case. Agents also failed to include in the photo book any photographs of anyone who looked similar to Rodriguez, effectively rendering the photo book an individual showup. Finally, the photograph of Rodriguez in the photo book was a mug shot while

photographs of some others were not, thus highlighting the Rodriguez photograph. Rodriguez argues that these characteristics of the photo book assembly and presentation would have led any interviewees to realize that everyone in the photo book was under investigation and would have increased the chance of misidentifying Rodriguez when they had someone else in mind.

The Government opposes suppression of the two identifications of Rodriguez. The Government asserts that agents assembled the photo book in a neutral way that did not indicate to interviewees that it was hoping to have someone identify Rodriguez. The Government asserts further that the instructions accompanying the presentation of the photo book were neutral in that agents asked only whether the interviewees recognized anyone depicted and how. Because the interviewees were free to explain how they recognized anyone from prior experiences, the Government concludes that this case differs from the more typical scenario in which law enforcement officials ask witnesses to identify a total stranger based on a brief and emotionally distressing encounter.

### III.  DISCUSSION

"The linchpin for admissibility of identification testimony is reliability. In reviewing a due process challenge to the admission of such testimony, we must look at the facts of each case and the totality of the surrounding circumstances. The ultimate questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the

circumstances, there is a very substantial likelihood of irreparable misidentification." *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) (internal quotation marks and citations omitted). When defendants challenge a photographic array as suggestive, courts review the array and assess "a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents. If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs or of suggestive comments, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that that person was more likely to be the culprit. The array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *Id.* at 974 (internal quotation and editorial marks and citations omitted).

The above references to a "culprit" or a "perpetrator" highlight one aspect of the typical review of suggestiveness that is critical to the review of the pending motion: the "closed-ended" nature of the witness identification. That is, the typical identification occurs after a witness observes a distinct perpetrator committing a crime or fleeing the scene of a crime. *See Manson v. Brathwaite*, 432 U.S. 98, 112 (1977) ("Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by

later actions of the police. Thus, Wade and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability."). The existence of a crime committed and a perpetrator with certain characteristics is a closed matter. Law enforcement officials then investigate the crime, and if their investigation leads them to one or more distinct suspects then they try to have the witness identify a suspect as the perpetrator. Suggestiveness in this typical scenario means that law enforcement officials do something or say something during the preparation and execution of the identification procedure that fills in the witness's memory of the fleeting encounter with or observation of the perpetrator. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."). The improper result of a suggestive procedure is a match between what the witness says and what law enforcement officials want the witness to say, which is not necessarily a match between the perpetrator and a suspect. *See Simmons v. U.S.*, 390 U.S. 377, 383–84 (1968) ("A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may

make an incorrect identification . . . . Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.").

In contrast, the interviewees who reviewed the photo book in this case controlled how many perpetrators might come under investigation, what crimes would be discussed with the law enforcement agents, and what the characteristics of the perpetrators would be, thus making the identifications of Rodriguez "open-ended." During the interviews preceding the photo book presentation, the interviewees controlled the conversation by discussing only their personal knowledge of events that might have been of interest to the agents. If the interviewees had fabricated any personal knowledge of events then the agents would have chosen not to present a photo book. When the agents presented the interviewees with the photo book, they asked the interviewees only to identify anyone they recognized and how they recognized them. *Cf. U.S. v. Zadiriyev*, No. 08 CR 1327(HB), 2009 WL 1787922, at *3 (S.D.N.Y. June 23, 2009) (denying a motion to suppress in part because "[t]here is no testimony that suggests the agents pressured the witness to make an identification or took any actions that would suggest the true identity of any of the individuals depicted in the array."). There was no distinct perpetrator toward which the agents might have wanted to push the interviewees, and the agents had no way to implant in

8

an interviewee's memory an entire relationship that would give rise to personal knowledge. The interviewees thus controlled whether and what kind of positive responses they gave the agents after viewing the photo book. Filler photographs would have further eliminated any chance of confusion between someone depicted in the photo book and some other person with whom an interviewee had a relationship. *Cf. U.S. v. De La Rosa*, No. 06-CR-6042L, 2008 WL 2595173, at *6 (W.D.N.Y. May 2, 2008) (Payson, *M.J.*) (Report and Recommendation) (denying a motion to suppress in part because "[t]he arrays containing Montilla's and Castillo-Martinez's photographs also contained photographs of other men with similar physical characteristics (age, complexion, facial hair, hair style and hair length). All were black and white photographs taken from a similar perspective (frontal image from the shoulders up)."), *adopted at* Dkt. No. 127 (Larimer, *J.*). The interviewees might have guessed that everyone depicted in the photo book was a person of interest in some way, especially after up to 10 hours of pre-presentation interviews. *Cf. U.S. v. Sinclair*, No. 10–CR–6211L, 2012 WL 5389729, at *1 (W.D.N.Y. Nov. 2, 2012) (Payson, *M.J.*) (recommending[2] denial of a suppression motion in part because "the agents did not debrief or question the informant about the investigation before showing him the binder of photographs and the meeting ended shortly after the identification procedure"). Even so,

---

[2] The Report and Recommendation remains pending before Hon. Frank P. Geraci, Jr.

however, the interviewees either had relationships with the people depicted in the photo book or not.  Barring an occurrence of the strange psychology of internalization sometimes seen with false confessions[3]—and the parties have presented no evidence of any such occurrence here—nothing that the agents said or did would have created personal knowledge where none existed.  The identifications of Rodriguez thus were not suggestive and do not require suppression.

IV. **CONCLUSION**

For all of the foregoing reasons, the Court respectfully recommends denying Rodriguez's motion to suppress the identification evidence against him.

---

[3] *See* Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3, 15 (2010).

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

*/s Hugh B. Scott*
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: November 13, 2013